## MARSTON *vs.* ROWE ET AL.

[BILL IN EQUITY, TO REMOVE CLOUD FROM TITLE TO LANDS, AND TO RECOVER POSSESSION OF SAME.]

1. *Act of congress of May 29,* 1830 ; *bond for titles, made in* 1831, *by owner of pre-emption right to land, void under ; what bond may be evidence of.* A bond for titles to land, given in 1831, by one having the pre-emption right to it, under the act of congress of May 29th, 1830, is void ; but is evidence of the character of possession of the obligee.

2. *Adverse possession, when established ; what will be presumed.*—When adverse possession of land, short of the period which creates a bar under the statute of limitations, is established, the continuance of it will be presumed, in the absence of any proof of abandonment, or possession by another under a claim of title.

3. *Trustee's sale ; regularity and validity of purchase under, who can not question.*—The regularity and validity of a trustee's sale, and of the purchase under it, can not be questioned by a stranger to the deed.

APPEAL from the Chancery Court of Mobile.
Heard before the Hon. N. W. COCKE.

The original bill in this case was filed on the 20th February, 1861, by Charles A. Marston, against Nancy Rowe and Thomas Gleason. The bill charged, in substance—

1st. That complainant is sub-vendee of Andrew Dexter, long since dead, and is, in fact, the owner of certain lands, (describing same,) being the same lands sold by said Dexter to Darling Collins, on the 20th October, 1836.

2d. That Nancy Rowe and Thomas Gleason are in possession of five acres of said land, and claim the whole of it, and interfere with rights of complainant, who is sub-vendee of said Dexter, who claims title from Joshua Collins, deceased ; that complainant is invested with all right, title and interest of said Dexter.

3d. That said Dexter, at said Collins' solicitation, lent him $150, to aid him in buying the lands in controversy from the United States ; that said lands were bought with said money ; that Collins, on the 15th of January, 1831, gave said Dexter a bond for titles to said lands, "as soon

as patent could be obtained from the United States;" that patent to said lands issued to heirs of Collins, who died soon after making bond, and without making title, as bound by bond; that Collins died in 1832, leaving a will, which was admitted to probate 19th day of March, 1832, in Mobile probate court, and devised all his right, claim, and interest in said lands to his youngest sons, Julius and Christopher Collins; Jacob and Darling Collins were appointed and qualified as his executors; that from execution of said bond, the west half of said lands was recognized by Joshua Collins, and his executors, as the property of Dexter, Collins claiming only the east half of said lands; that all the children and heirs of said Collins, and his executors, recognized and observed this right, and only claimed that the interest devised by Collins related to the east half of said lands; that this continued until Dexter's death; that Dexter held possession of the west half of said lands up to his death; that the devisees of said Collins, claiming only the east half, had it surveyed and divided into ten acre lots, and a map of the same recorded in register of deeds' office, on the 14th of January, 1839; Dexter, on — day of ——, 1833, had the west half of said land surveyed into ten acre lots, marked the same by visible stakes, &c., some of which still exist, and opened streets through the land, which streets are still well known and recognized by the public; that all this was done with full knowledge of devisees.

4th. On the 20th of October, 1836, Dexter, for $1000, sold the lands above described to Darling Collins, one of the sons and executors of said Joshua Collins, deceased. The deed was recorded 19th April, 1837; that on the 16th of May, 1837, said Darling Collins conveyed and sold by deed said lands to Newton St. John; deed recorded May 25th, 1851. St. John conveyed by deed to Peter Corney, jr.; deed likewise recorded; that on August 2d, 1852, Joseph Ela became purchaser of said lands, at sheriff's sale, under execution against Corney; deed likewise recorded; that Ela sold the land to Alling, on the 13th March, 1854; deed recorded; that Alling sold the land to complainant; deed recorded 20th December, 1859; that various owners of land, as shown through Dexter, paid taxes regularly on

land, kept off trespassers, controlled the land, and were recognized by the public as owners, but never actually enclosed or lived on the land; that the purchase of Darling was well known to Nancy Rowe, who is Collins' sister, and who lived near said piece of land; that Nancy Rowe and Thomas Gleason have taken possession of five acres of the land, and, together with Christopher Collins, induced the attorney of the branch bank to issue *pluries* executions upon a judgment in its favor, rendered 19th May, 1845, against Joshua and Christopher Collins, and caused said west half of the quarter section of land (the land owned by complainant) to be levied on and sold, as the property of Joshua and Christopher Collins; that Nancy Rowe purchased, at said sale, took actual possession of five or six acres of said land, and pretends and claims her title to be good to the whole, and that complainant and those claiming under Dexter have no title whatever; that the executions on said judgment issued from term to term regularly, until fall term, 1849; that the bank never caused said lands to be levied on before, and that each execution was returned "no property found;" that no other execution issued on said judgment until the 14th day of October, 1858; that the sheriff executed a deed to said Nancy Rowe to the lands before described, which were purchased by her as aforesaid, on the 1st Monday in December, 1858; that said Nancy Rowe has caused said deeds to be recorded; that the execution under which said Nancy Rowe bought, came into the sheriff's hands on the 29th of August, 1858; that Joshua and Christopher Collins left this State shortly after their father's death, and reside in Mississippi; that both are utterly insolvent, and have been in this State at various times, and never repudiated the obligations of the bond referred to, but always recognized it, until the confederation with Nancy Rowe, as aforesaid."

The bill charges, that whatever Nancy Rowe may have acquired by said purchase, if she acquired anything, she holds in trust for complainant; and further, that said purchase, and the record of her deed, throw a cloud over complainant's title, and embarrass it and the sale of the land.

The bill prays, that "Nancy Rowe and Thomas Gleason be compelled to render possession of said lands" to complainant, and that "the title of said Nancy Rowe thereto may be divested from her, and the legal title to said lands be vested in him, and for other and further relief, as may be necessary."

The bond of Collins, which was executed on the 15th of January, 1831, is made an exhibit to the bill ; is in the penalty of $300, and is conditioned as follows : "Whereas, the said Joshua Collins is entitled, by a late act of congress, to the right of pre-emption to the purchase of the southwest quarter of section 14, township 4, and range 5, on which he is now living ; and the said Dexter has agreed to pay the United States the sum of $150 towards the purchase thereof ; in consideration of which, the said Joshua Collins has agreed to convey to him, his heirs or assigns, a good and sufficient title in fee, to eighty acres of land thereof, as soon as the patent shall be obtained for said quarter section ; the said lands are to be so divided as not to include the improvements and buildings of said Joshua Collins, and hereby intending to convey to said Dexter the western half of said quarter section. Now, therefore, in case said Collins, his heirs or assigns, shall well and truly execute his said agreement, then this obligation to be void, otherwise to remain in full force." (Signed) "Joshua Collins, Jacob Collins," and attested by two witnesses.

The defendant, Nancy Rowe, filed a sworn answer, denying any title whatever in complainant to said lands, because the bond, Exhibit A, (Collins' bond to Dexter), is void, and of no legal effect ; denying that Dexter, or any one claiming under him, ever went into possession of said lands, or any part thereof ; charges that Darling Collins never had actual possession of said bonds, or any one claiming from him during his life, and that he died —— day of June, 1840 ; that the deed of Darling Collins to St. John and others, was recorded long after his death, and conveyed no title, except as provided in the deed ; that it was a *trust deed*, and the sale to convey was not made in pursuance of the trust, and was made long after Collins' death, and, therefore, complainant has no title, through it,

Marston v. Rowe et al.

to the lands ; that the deed from Sheriff to Ela was predicated on an execution in favor of Alling, and the deed from Ela to said Alling, and from Alling to complainant, were all quit claim deeds, and that there was no actual possession, or acts of ownership, over the land by any person claiming under either of said deeds ; that the allegations of complainant's will, as to the death of Collins, probating of will and contents thereof, and the issuance of land patent, are true ; that after the death of Collins, her brother always refused to recognize the bond for titles to land, made to Dexter, or any one claiming under Dexter, or to execute a deed therefor ; that complainant, who is a daughter of Collins, sr., and sister to Darling Collins, had bought a portion of the east half of the land from her younger brothers, Joshua and Christopher, and up to 1852, occupied said lands, and by permission and remission of her younger brothers, used the west half of said lands ; (the lands claimed by Marston, for getting out timber and firewood, and keeping trespassers off) ; that after 1852, by consent and request of her brothers, she took actual possession of said west half, and has held possession ever since, paying taxes thereon ; and this was the only *actual* possession ever had of said lands ; that Gleason was her tenant, and surrendered possession in 1860, and since died. The answer admits the purchase of lands at sheriff sale, including the five acres of land of which she had actual possession from 1852 up to 1858, when she bought at sheriff's sale ; and that her claim to said lands was *open and notorious ;* that the deed from Alling to complainant was void, and conveys no title, the land being held adversely by her at the date of the execution of said deed. The answer positively denies all confederation, combination, or fraud, and insists that defendant is a *bona fide* purchaser for a valuable consideration.

The trust deed from Darling Collins is made an exhibit to the answer. The deed, after reciting the consideration, parties to the deed, and description of the land, provides that the grantees, " or any of them, or either of them, or the survivor of them, or their heirs, administrators, or as-

signs, may sell the property," or as much as may be necessary, to pay the amount secured by the deed.

The defendant also demurred to the bill for want of equity, and the chancellor sustained the demurrer for want of equity, on the ground that the contract between Dexter and Collins, sr., as evidenced by the bond, (Exhibit A,) was in violation of the pre-emptions laws, and, therefore, void ; citing *Tennison v. Martin*, 13 A. R. 21, and *Dial v. Hair*, 18 A. R. 798.

At the January term, 1866, this court reversed the decree of the chancellor, and remanded the cause, deciding that there was equity in the bill.—See *Marston v. Rowe*, 39 Ala. 722.

On the final hearing, the case was submitted on the proofs and pleadings. The testimony in the case is very lengthy, but a full statement of it is not material to an understanding of the legal questions here presented. On the part of complainant, the depositions of three witnesses were taken. The defendant offered no evidence, beyond her sworn answer, denying all the material allegations of the bill.

The deposition of E. A. Lewis, witness for complainant, is, in substance, as follows : "I have known the land since 1820, long before it was entered ; had been on it often and seen the stakes referred to ; "*after land was entered, John Collins lived on and claimed the east half of the land ; Dexter claimed and controlled the west half ;* Darling Collins purchased twenty acres from Dexter ; Darling owned and controlled this twenty acres, and Dexter owned and controlled the balance of the quarter section ; one Parker purchased a ten acre lot on said west half from Dexter ; " Parker improved this lot and lived on it," and afterwards sold it to one Wages ; Wages sold to one Shepherd ; this was ten or twelve years ago ; Christopher Collins took possession of said ten acre lot, after it was sold to Parker, until sold to Shepherd. A few days after Christopher Collins took possession of said lot, witness had a conversation with him in relation to said premises being on the west half of said lands, and Collins told witness that the bond was lost and he intended to claim all the land. "*A suit was soon after brought against Collins by Shepherd to recover the lands, and*

*Collins was dispossessed."* Mrs. Rowe enclosed about five acres of land on the west half of said land and built a house on it, about eight or ten years ago ; that during Dexter's life he owned and controlled the west half of said land as his own, and was recognized by Joshua Collins and all his children as owner of the west half of said land. Dexter did not enclose said lands, but marked it by stakes which were visible to all. About the commencement of the war, a small enclosure was made on the land sold to Darling Collins, by Turner and McLean ; it was generally understood that they went on the land by permission of Mrs. Rowe. Afterwards Thomas Gleason went on said lands, and built a house on the land, and went into business with said Turner and McLean ; Turner & McLean did not long remain, and after they left, Gleason remained a year or more. " The land was not enclosed, but Andrew Dexter had it staked off in ten acre lots, and openly and publicly exercised acts of ownership over it. This was between 1831 and 1883, as near as I can recollect. He exercised ownership over said land by having it staked off and platted, and letting it be known to all, that the land was under his control ; this was known to Joshua Collins and all his children ; they lived at the time on the half of said quarter section, about three or four hundred yards from the west half, as near as witness could recollect ;" that several years after Dexter laid off his land, the children of Collins had the half laid off and platted ; Dexter laid off his lots somewhere about 1831 and 1833, and gave the surveyor one ten acre lot for his services ; no one ever occupied or resided upon said lands, (the west half) except Parker, which was about eighteen or twenty years ago ; Joshua and Christopher Collins never lived on the west half of said lands, except the short time that Christopher Collins occupied them and from which he was dispossessed, as before stated ; know nothing whatever of any suit being instituted by Collins' children about any land ; " I know that Joshua Collins *always* treated the west half as the property of Dexter ; I have frequently heard him express thanks and gratitude towards Dexter for aiding him in procuring the aforesaid quarter section, as it only cost him a trifle more

than the west half of said quarter section; I have had frequent conversations with all the children and never heard any of them claim said land, but they always admitted the same to be the property of said Dexter, until Christopher Collins took possession of a portion of it as already stated; since that time none of the children of Collins, except Mrs. Rowe, have claimed said lands." In answer to the cross-interrogatories, the witness deposed substantially as follows: Darling Collins has been dead about twenty years; he did not improve said land; Joshua Collins died several years before his son Darling died; Joshua and Christopher Collins did not claim said lands, but always in conversation with him, openly and publicly acknowledged it to be Dexter's property; Darling Collins never tried to get Joshua and Christopher Collins after his father's death, to give him a deed to the land bought by him from Dexter; has known Mrs. Nancy Rowe thirty years; when first knew her, she was living on east half of said lands.

Simeon Wheeler, testified—that he had known the lands for fifteen years certain, and since its entry; that Darling Collins claimed said lands, and that Joshua Collins and Dexter first controlled said lands; then follows testimony, substantially the same as Lewis' as to who had lived on the land; knows nothing as to whether Collins claimed or did not claim west half of said lands; none of Collins' children lived on the west half of said lands, except, perhaps, Christopher—not positive as to Christopher's residence. After Parker left the land bought by him, Wages lived there; this was known to Collins' children, who were then all living on east half of said lands; remembers some kind of suit about land in which Christopher Collins was unsuccessful, but none of the particulars about it.

Lewis Gager testified, that he knows the land mentioned; knows nothing of deed from Dexter to Collins; but does know that in the year 1837–38, Darling Collins had possession and control of said twenty acres of land; land had a house on it, but by whom occupied, does not know; thought it was Darling Collins' house; have heard Collins' children say that Dexter owned the west half of the quarter section, and that it was the agreement that he was to have one-

half of the land, by paying one-half of the expenses of getting the patent from the government; knows nothing about the agreement between Dexter and Collins, senior; witness surveyed the land for Collins' children; they told him explicitly that the west half was property of Dexter; knows that Parker got some of said land from a man named Wages; that Collins' children lived in the neighborhood and must have heard of it; did not know of their having objected; never heard of anybody claiming pre-emption right to land of Collins; knows that he gave west half of it to Dexter, as compensation for obtaining patent from United States government; knew Dexter well; don't remember when he died, or where; was well acquainted with Darling Collins when he died, and have seen him in actual possession of said twenty acres. Witness afterwards corrected his testimony as follows: " Does not know of the twenty acres on the west half of the south-west quarter of section fourteen, township four, south, range two, west; but does know of said Darling Collins owning twenty acres on the east half of south west quarter of section fourteen, township four, south, range two, west, where Charles N. Marston lives; Darling Collins never lived on the twenty acres enquired about, so far as I know; I never knew him to live on any part of the land than that part of quarter section as above stated; surveyed lands in 1836 or 1837, and the conversations spoken of occurred in 1836 or 1837; the family tract of land on which I saw Darling was on east half, and not on the west half of section fourteen." The following are the answers of Newton St. John to the interrogatories propounded to him : " At the time Exhibit B. was made, C. Milton Pope was dead; I do not recollect whether anything was done under Exhibit A, further than appears in Exhibit B. The parties named in Exhibit B, were the sole heirs and devisees of Alexander Pope, surviving at the time said deed was made, and the interest of the other heirs and devisees had been purchased and acquired, and was wholly vested in the grantors in Exhibit B."

Gager's deposition was taken 28th June, 1868; Wheeler's on 28th January, 1867; Lewis' on 25th January, 1867.

The chancellor, on the final hearing, on proof and plead-

ings, dismissed the bill for want of equity, and his decree is now assigned as error.

J. LITTLE SMITH, for appellant.—1. The putting of Dexter into possession, and the payment of the purchase money, gave to Dexter and his vendors a right to the land, without any title in writing, which a court of equity will protect against Joshua Collins, senior, and the defendant, claiming under him, especially as she had notice, and recognized and acquiesced in the claim of those through whom the complainant derives title for so many years. And the chancery court would give this protection, independent of any acquisition of title by adverse possession.—*Brewer v. Brewer & Logan*, 19 Ala. 488. These things take the sale out of the statute of frauds.—Code, § 1862.

2. The defendant knew of the right set up by the bill, and if she is not estopped by the acts and declarations of Joshua and Christopher Collins, and of herself, still she bought with full knowledge, as stated. But even suppose she did not know, she has not shown or proved that she paid any thing for the land, and the recitals in her deed are no evidence that she did. She is not, therefore, a *bona fide* purchaser.—*Nolen v. Heirs of George*, 16 Ala. 728; *McGintry et al. v. Rupe*, 10 Ala. 137.

3. If this were a suit to enforce the specific performance of the bond, the court might not decree the performance, though this case differs from the decided cases, where there was an attempted cession of the entire claim or right of the pre-emptor, or where the controversy was with *bona fide* purchasers. This question, however, it is unnecessary to consider, as the case mentions the bond incidentally only. It rests on other principles, or was determined by the supreme court in cause reported in 39 Ala. Rep. 722, and which decision is the law of this case, so far as it touches the present issues.

The bond, however, may be looked to in considering the complainant's rights under the possession given to him, and the acknowledgment of his right; and, also, in considering his right under the doctrine of adverse possession; for the bond declares that the land which Collins,

Marston v. Rowe et al.

the obligor, intended to convey, was the entire west half
of the quarter, so that, when Dexter was let into possession
on execution of the bond, he was put into possession of the
entire west half; and as the obligor and his children de-
clared that the west half was his, then, under the doctrine
of adverse possession, the possession of any part of the
land for the requisite time, would be a possession of the
whole land described in the written instrument, under
which he claimed to have entered and to hold; for it
has been held that a party in possession, claiming under
a bond or deed, believing it to be genuine, might set up
adverse possession under it, although the bond might,
in fact, be forged; for, as to the claim, it is a matter of
intention. Such a case is put in a Georgia decision, and is
quoted with approval by our court. This is important,
because it appears that Dexter, Jonathan Parker, Wages,
and Shepherd held a portion of the west half till ten or
twelve years next before January, 1869, when the witnesses
testified—that is, till 1855 or 1857—which is more than
twenty years from the date of the adverse possession and
claim, commencing about 1833. The acts of ownership of
Dexter and his vendees were certainly done under a claim
to the west half, and all, with a full knowledge of the
defendant, and of Joshua and Christopher Collins, through
whom she claims title. The acts of possession were visible
and notorious acts of ownership. They were such acts
as a man would do with, or exercise over, property which
he claimed in his own right, and which he would not do
with or exercise over property which he did not claim as
his; and this is all sufficient for the operation of the doc-
trine of adverse possession, when they are known to the
one against whom the doctrine is invoked; or, if not
actually known, when such acts are open and notorious,
and under claim of title or ownership. For cases on this
subject, see *Ewing v. Burnett*, 11 Peters, pp. 43, 52, 53, 54;
10 Peters, 442; 6 Peters, 513; *Brown v. Cockrill*, 33 Ala.
p. 42, § 2 and p. 46; *Stewart v. Stokes*, 33 Ala. 495; *Mc-
Arthur v. Carn's Adm'r*, 32 Ala. p. 80; *Hubert v. Hanrick*,
16 Ala. 595 and 596; 11 Ala. 1043; 13 Ala. 55. As to

time, see 2 Story' Eq. Jurisp. § 1520 ; 21 Ala. 644 ; 28 Ala. 635.

Even if the bond were void, and Dexter had known it, that would not affect the question.　See former decision in this case, 39 Ala.; *Manley v. Turnipseed,* 37 Ala. 536, 532 ; *McArthur v. Carn's Adm'r,* 32 Ala. 80.

In this last case, possession commenced under an administrator's sale, which was void.　A statute may prohibit an act, but it does not, therefore, follow that courts of justice will not enforce contracts relating to or based on the act prohibited.　The act must be looked to, and that when the contract is sought directly to be enforced as an independent right.—*Harris v. Runnels,* 12 How. S. C. R., p. 79.

But the defendant cannot set up that the bond is void. The ancestor of Christopher and Joshua Collins, and they themselves, as well as the defendant, recognized the validity of it, and executed it *pro tanto,* by giving possession, and she is estopped.　Moreover, the ground upon which such bonds have not been enforced by the courts when unexecuted, and the aid of the court is invoked to compel execution, is that they tried to invite speculation, and to enable capitalists to deprive the pre-emptor of land he is entitled to, but in this case the pre-emptor was enabled to secure his improvements, and, besides, he for whose benefit the principle might have been invoked, waived it, by executing as shown, and the defendant is estopped from setting up that objection.

By way of special defense, it is insisted that the powers in the trust deed to St. John and others, were not strictly complied with, and, therefore, that the deed to Peter Corney was a nullity, and the complainant's title is defective. The answers are :

1. That defective titles, in the commencement, have nothing to do with a right of property acquired, or sought to be acquired, by adverse possession, which ignores and combats all antagonistic rights.

2. Mrs. Rowe is a stranger to the deeds of Collins, and of St. John and others, and, therefore, cannot object that deed was not made in conformity with the power.—*Hubert*

*v. Hanrick*, 16 Ala. 599 ; *Huckabee v. Billingsly*, 16 Ala. 418 and 419.

The *cestui que trust* is the owner in equity, and in this case the *cestui que trust* joined with the surviving trustees, N. St. John and A. L. Pope.

The defendant's counsel insists in his brief, that the defendant's answer alone (virtually admitting that there is no proof) is sufficient, because he says it is responsive to the allegations of the bill. He is very careful not to specify the allegations, which he asserts exists, and he was careful because no such allegation is to be found in the bill, and his defense of adverse possession is new matter, set up in the answer, which should have been proved.

HALL & LABUZAN, *contra*.

[Appellees' brief did not come into reporter's hands.]

B. F. SAFFOLD, J.—The court has heretofore decided, tha if the facts stated in the bill of the complainant are true, he is entitled to the relief prayed for.—*Marston v. Rowe*, 39 Ala. 722. The cause has since been tried on the merits, and the bill dismissed, on the ground that conceding the adverse possession of Dexter and of Collins, from 1833 to 1847, the proof fails to show an uninterrupted continuance of the possession in any one claiming under them since that time.

The view of the case, by the chancellor, makes it necessary to consider all the points of difference presented by the pleadings.

These are—1st. The validity of the bond for titles executed by Joshua Collins to Dexter, in 1831. 2d. The character and continuance, for thirty years, of the possession of Dexter and his vendees, of the land in controversy. 3d. The ownership by the complainant, Marston, of any title derived from Dexter. 4th. The adverse possession of the defendant, Rowe, at the date of the deed from Alling to Marston, in 1849. 5th. The validity and effect of the purchase, by the defendant, at the sheriff's sale of the land, as the property of Joshua and his brother, Christopher Collins, in 1858.

The act of congress of May 29, 1830, under which the pre-emption right of Joshua Collins, sr., to this land was acquired, declares, " That all assignments and transfers of the right of pre-emption, given by this act, prior to the issuance of the patent, shall be null and void.—U. S. Stat. at Large, vol. 4, p. 421, § 3. The patent was issued in 1833. The bond given by Joshua Collins to Dexter, in 1831, being equivalent to such assignment and transfer, is illegal and void.—*McElyea v. Hayter*, 2 Porter, 148. Joshua Collins died in 1832, and it is not professed that either he or his devisees made any new contract with Dexter, which might be sustained by the act of January 23d, 1832, supplemental to the above. Even this latter act has not been construed to apply to sales of pre-emption rights, prior to the entry at the land office.—13 Ala. 30.

The bond, though invalid, is evidence of the character of Dexter's possession. It and the testimony of the witnesses, Lewis Wheeler and Gager, prevail over the denial of the answer, and establish the facts that Dexter was notoriously claiming title to the west half of the quarter section, before the death of Joshua Collins, sr. ; that he divided it into lots, and sold them to various persons, designating the boundaries by stakes ; that his acts of ownership and claim of title were well known to the children and devisees of Joshua Collins, sr., and recognized and acquiesced in by his devisees, Christopher and Joshua Collins ; that the lot of twenty acres, now in dispute, was sold by Dexter to Darling Collins, the brother of the defendant, Rowe, in 1836, and that the said defendant was cognizant of all that was done. Such acts of ownership and occupancy, brought to the knowledge of those to be affected by them, are sufficient to constitute adverse possession, although the land was never actually lived on or enclosed.— 6 Peters, 513 ; *Marston v. Rowe*, 39 Ala. 722 ; *Brown v. Cockerell*, 33 Ala. 38. The testimony further shows that Darling Collins claimed, and was in possession of, the twenty acre lot in question, and conveyed it by deed of trust, to secure the payment of certain debts to Newton St. John and others, in 1837. It is uncertain when Darling Collins died, but the proof tends most strongly to fix the

time in 1847. His deed to St. John was not inconsistent with his continued possession during his life. The three witnesses say generally that the children of Joshua Collins, sr., including Mrs. Rowe and Christopher and Joshua, jr., knew of the claim and the possession of Dexter and his vendees, and never sought to obtain possession of the property until about 1855, when Christopher, under the impression that the bond of his father was lost, attempted to oust Shepherd, and was evicted by action at law.

If the testimony fails to show any actual, positive possession of the land, after the death of Darling Collins, by any of those from whom the complainant claims to derive title, it does not show any abandonment by them; nor does it show any occupancy by those from whom Nancy Rowe claims to deduce her title. It is true, the complainant must recover on the strength of his own title, but it is enough if he shows a right to recover against the defendant.— *Garret et. al. v. Lyle,* 27 Ala. 586. The occupation of Dexter, and of Collins, from 1833 to 1847, being shown, any person claiming title by deed from them, could, as late as 1853, have evicted one having only a possessory right, on the ground that a prior possession, under a claim of right, short of the period which creates a bar, under the statute of limitations, will prevail over a subsequent possession, when no other evidence of title appears on either side.—*Smith v. Lorillard,* 10 Johns. Rep. 339 ; *McCall v. Doe ex dem. Pryor,* 17 Ala. 533 ; *Badger v. Lyon,* 7 Ala. 464. *Doe ex dem. Heydenfeldt v. Mitchell,* 9 Ala. 70 ; *Smoot & Nicholson v. Lecate,* 1 Stew. 590.

The continued possession will be presumed, in the absence of any proof of abandonment. The proof is, that neither the defendant nor the devisees of Collins, nor any one claiming under them, had, or claimed possession before about 1855.

The sale by St. John, to Corney, in 1851, and the sale under execution against Corney to Ela, in 1852, are circumstances of notoriety, in the claim of possession, and of claim of title, by the vendors of complainant. Twenty years' adverse possession having been completed in 1853, constructive possession, by deed, could have been, and

was conveyed by Ela to Alling, in 1854, and by Alling to complainant in 1859.

The objection of the defendant, that the complainant had not the title of Darling Collins, because the grantors of the deed to Corney are not the grantees of the deed from Collins, and because the terms and stipulations of the the trust deed were not pursued, cannot prevail. St. John testifies that those who conveyed to Corney, possessed all the interests of the grantees of the trust deed. Besides, the deed itself says the surviving grantee may execute the power of sale, and St. John was the survivor. Mrs. Rowe being a stranger to that deed, cannot be heard to complain of informalities and irregularities, in the execution of the powers conferred by it.—*Herbert v. Hanrick,* 16 Ala. 581; *Huckabee v. Billingsley,* ib. 418; *Gary v. Colquitt,* 11 Ala. 514; *Foster v. Goree,* 5 Ala. 424; *Brown v. Lipscomb,* 9 Por. 472.

At the time of the professed sale of this property by the sheriff, at which Mrs. Rowe became the purchaser, in 1858, Joshua and Christopher Collins had no such interest in it, as was subject to levy and sale under execution. Whatever interest they might, at an earlier day, have asserted, had then been lost by their laches. Consequently, Mrs. Rowe acquired nothing by her purchase.

The testimony disproves the assertion of her answer, that she had adverse possession of the land, sought to be recovered from her, at the execution of the deed from Alling to complainant, in 1859, by fixing the beginning of her occupancy in 1862.

The decree of the chancellor is reversed, and the clerk of this court will enter the following decree instead thereof: It is ordered, adjudged, and decreed, that complainant, Charles A. Marston, recover of the defendants, Nancy Rowe and Thomas Gleason, the possession of that portion of the west half, of the southwest quarter of section fourteen, township four, south of range two, west, of the lands subject to sale at St. Stevens, Alabama, lying in the county of Mobile, near Spring Hill, described and bounded on a map drawn by Dean Knox, surveyor, as follows, to-wit: Said parcel of land is a parallelogram rectan-

gular, containing twenty acres, bounded on the north by Pine street, on the east by Eighth street, on the south by Jefferson street, and on the west by a line commencing at a point on the south boundary line, and equidistant from Eighth and Ninth street, to the north boundary line. Said land is the same sold by Andrew Dexter to Darling Collins, on the 20th of October, 1836, being the same parcel of land described in the said complainant's bill of complaint. And that the register of the chancery court, for the first district of the southern chancery division at Mobile, issue to the sheriff of Mobile county a writ of *habere facias possessionem* in behalf of said complainant, against said defendants ; that the pretended deed to said land made by the sheriff of Mobile county to said defendant Rowe, on the first Monday of December, 1858, is declared null and void, as against the said complainant ; and that the title to said land be vested in the complainant, as against the said defendants ; and that the said complainant recover of the said defendants the costs of this appeal, and of the court below, for which let execution issue.