9 So.2d 891

### SISSON et al. v. SWIFT et al.

#### I Div. 156.

Supreme Court of Alabama.

June 25, 1942.

Rehearing Denied Oct. 8, 1942.

Harry T. Smith & Caffey, of Mobile, for appellants.

294

Hybart & Chason, of Bay Minette, for appellees.

THOMAS, Justice.

The bill as amended was to quiet title. It is filed against the land as a proceeding in rem, and against the respondents. That pleading complies with the required allegation under § 9912 et seq., Code 1923, Code 1940, T. 7, § 1116, and was a compliance with § 9905 et seq., Code 1923, Code 1940, T. 7, § 1109 et seq. The latter is the statute long prevailing to quiet title.

The Act of October 1, 1923, Acts 1923, p. 699, known as the Grove Act and entitled, "To provide for the establishment of titles to real estate by a proceeding in rem," has been codified in §§ 1109 to 1115, Code 1940, T. 7. The previous system of procedure for quieting title is preserved intact. The two systems overlap as to bills of complaint by persons "in the actual, peaceable possession" of the land, with respect to relief against known respondents upon whom process is served. The Grove Act extends the relief to cases where no one is in the actual possession, if the complainant, or he and those under whom he claims, has held color of title and has paid the taxes for ten or more consecutive years next preceding the suit; and to cases where the complainant or he and his privies in claim has paid the taxes during the whole of such period, and no other person has paid the taxes during any part of said period, regardless of the status of actual possession. Miller v. Gaston, 212 Ala. 519, 520, 103 So. 541.

The answer of respondents among other things is:

"Each of the Respondents disclaims any right, title or interest in any of the tracts of land described in the caption of the complaint or any portion thereof, *save and except such portions thereof as are covered by the following described lands,* viz: (Italics supplied.)

"Commencing at the SW corner of the Thomas Powell tract, thence northwesterly along the west line of said tract, to a point where the SE corner of land owned by John Nolte intersects said Thomas Powell tract, thence SW along the southerly line of said land owned by John Nolte to the first stake standing on said line owned by said Nolte and purchased of H. A. Grist, thence SE on a line parallel with the westerly line of the Thomas Powell tract as far as the end thereof, thence continuing said line in the same direction parallel with the Southwesterly line of the Cataline Plock Claim to the point of intersection with the west line of section eight (8) thence north on said section line to the intersection thereof with the Thomas Powell tract, thence NE along the end of said tract to a stake in the center thereof, thence southeasterly *on a line parallel with* the SW line of the Cataline Plock Claim to the intersection of said line with the N line of section seventeen (17), thence westerly on said section line to the west line of section eight (8) to the first point of intersection of said section line as aforesaid, and also the SE quarter of the NE quarter and NE quarter of SE quarter of section seven (7), all in township eight (8) south, range three (3) east in county of Baldwin, State of Alabama."

Respondents further say said lands are owned by appellee, "Said property, so described, being Lots 1, 2, 3, 4, 5, 6, 7, 8 and 9 according to that certain map of the Sisson lands, situated in Fractional Sections 6, 7 and 8, Township 8 South, Range 3 East, made by W. L. Durant, under date of June 8, 1913 and recorded August 31, 1915, in Map Book 1, page 2 in the Office of the Probate Judge of Baldwin County, Alabama, * * *."

It is alleged that complainant was not in possession of any part of the land when the bill was filed. The sale of lands under the later survey by the United States Government and conveyances made from time to time by respective parties claiming an interest therein has caused confusion. So of the reference to the river to which the lands are adjacent.

It will be noted that in several of the ancient conveyances there are recitals of material facts to be considered. On March 1, 1859, the United States patented fractional Section 8, T. 8 South, Range 3 East, to John G. Williams. Instead of being surveyed in quarter sections, the land was surveyed in lots indicated from one to nine, inclusive, south and west of Cataline-Plock Grant.

The patent to Williams of said fractional section 8 covers lands here claimed by the appellant Nannie L. Sisson, and part of the lands claimed by Wesley Sisson.

As we indicate, John G. Williams, living in North Carolina, under date of January 24, 1867, made a deed of assignment for the payment of named and unnamed creditors, and purported to be a certain large tract of land in Baldwin County and stated that the lands were conveyed to Thomas C. Singletary in trust to apply the proceeds of sale to payment of debts. The descriptions in the said deed of trust dated January 24, 1867 of John G. Williams to Thomas C. Singletary state that there are contained in said tract of land 12,000 acres. Said lands are described as follows: " * * * My interest (being the un-divided one-half) on a tract of land situated on the East Prong of Fish River in Baldwin County, Alabama, known as the William & Grist or Grist & Stickney Place, containing Seventy-five Hundred (7500) acres more or less, with stills and appurtenances there unto belonging. Also my un-divided one-half interest in the tract of land near the North Prong of Fish River and partly on Pole Cat Creek known as the property of William & Rupert, also my un-divided one-half interest in a tract of land adjoining the one last mentioned, known as the property of Rupert Whitehurst Company containing about Twelve Thousand (12,000) acres more or less, * * *."

The alleged John Williams heirs conveyed to T. Green, on June 25, 1896 lands described as follows: " * * * all our rights and title in any-way belonging, in-herited by us under the deed of trust from said John G. Williams to Thomas Stickney, also deceased, in all these pieces parcel *for* tract of land being lying and situated in Baldwin County in the state of Alabama and described as the one-undivided half interest in the lands known as the John G. Williams & John W. Grist Land and John W. Grist, John G. Williams, & Alexander T. Redditt Land in Township Eight (8) South, Range Three (3) and Four (4) East, and in Township Seven (7) South, Range Three (3) East, and the same tract of land conveyed and deeded to John G. Williams to John W. Grist and to John W. Grist to John G. Williams in said Township and ranges above aforesaid by Alexander T. Redditt and wife, A. G. Orrill, Stephen Dowty, John C. Orrill, Samuel M. Labazan, *Chritpher* Orrill, Jacob McGee, and wife, Thomas F. Stickney and Register and Receiver of the Lands Office, St. Stephens, Ala., containing about Seven Thousand (7000) acres more or less in the above aforesaid Township and Ranges, all of said land will be more fully described by referring to the deed and reports; * * *, and all other land belonging to said John G. Williams in said County and State aforesaid." (Italics supplied to indicate errors in original transcript.)

It is recited in this instrument as to ownership: "That we, Hattie M. Banks and her husband of Gainsville in the state of Georgia, C. H. Watkins and J. L. Watkins, her husband of Milton in the State of North Carolina and John W. Snead of Gainsville in the State of Georgia, now of mature age and unmarried, that *being the sole and surviving heirs of John Williams, deceased of Beauford in the state of* North Carolina." (Italics supplied.)

The consideration was $1,000.

On July 20, 1898, Thaddeus Green, "*a single man,*" " * * * conveyed and delivered unto the said Carrie C. McNulty and assigns all my right, title and interest in any way belonging to me in and to all those pieces, parcels and tracts of land being, lying and situated in Baldwin County in the State of Alabama, heretofore conveyed to me by Deed from Hattie Banks et al., dated 25th day of June, A. D. 1896, recorded in Book 'x' of Deeds, pages 558–560 in the Probate Court of Baldwin County, State of Alabama, and described as the one undivided half interest in the lands known as the John G. Williams and John W. Grist lands and the John W. Grist

and John G. Williams and Alexander T. Redditt lands in Township 8 south, Ranges 3 and 4 East, and in Township 7 South, Range 3 East being the same tract of land conveyed and deeded to John G. Williams and John W. Grist and John G. Williams in said township and ranges above referred to aforesaid by Alexander T. Redditt, A. G. Orrell, Stephen Dowty, John G. Orrell, Sam'l M. Labuzan, Christopher Orrell, Jacob McGee, Thomas F. Stickney and Register and Receiver of the Land Office at St. Stephens, Alabama, containing about 7,000 acres, more or less, in the aforesaid township and ranges, all of said lands will be more fully described by reference to the Deeds and Records in the Probate Court of Baldwin County; * * *."

The record further shows a conveyance of date of March 11, 1904, signed by the alleged Singletary heirs, conveying the lands therein indicated to *Carrie* C. McNulty, reciting ancient facts. The record further shows a conveyance by Carrie C. McNulty to C. A. Swift of lands described as "all the real property in Baldwin County, Alabama, more particularly described as follows:

"All of fractional section 6. All of Fractional section 7, except the NE 1/4 of the NE 1/4 and the SW 1/4 of the SW 1/4. All of fractional section 8, * * *. All the above described lands is in Township eight south of range three east St. Stephens Meridian.

"Also all of the Cataline Plock Grant or Tract and the Thos. Powell Grant or tract, according to plat lying in township eight south of range three east."

It is insisted by appellee that the McNulty-Swift deed made a chain of title from the government to the Swift heirs to Section 8. This title was before the court in Swift et al. v. Doe, ex dem. Williams, 162 Ala. 147, 50 So. 123. The other side of the question for consideration rests under conveyances from tax and execution sales and adverse possession to and by appellant.

The record further shows of real estate sold for taxes on June 7, 1880, and the persons redeeming the same "assessed to Henry Sisson, all of Section 7 (634,40A), fractional section 8 (291.30A), and South Part of Plock tract (287A) of said township and range."

The conveyance of Williams to Thomas C. Singletary indicated a list of creditors of which that grantee was a creditor in

the sum of $1,000, and is of date of January 24, 1867.

The holdings of this court are to the effect that when the legal and equitable title is merged by a conveyance the title to the property is vested in such person. In this case it is insisted that it descended by inheritance to Singletary's heirs. Welsh v. Phillips, 54 Ala. 309, 25 Am.Rep. 679. In the Welsh case the general rule is stated as follows: "At law the rule is inflexible, that where a greater or less, or a legal and equitable estate, coincide in the same person, they are merged; in equity, the merger depends on the intention of the parties."

See Otis v. McMillan & Sons, 70 Ala. 46; Ex parte Jonas, 186 Ala. 567, 64 So. 960.

The deed of trust to Singletary was to secure payment of various and sundry debts owing by said John G. Williams to *fifteen named creditors* ranging from $9.10 to $1,000, including Singletary himself, and then to secure all other creditors of said Williams, any balance to be paid over to Williams. Accordingly, the deed was not an absolute conveyance of title to the grantee named, but was, by its terms, *a trust deed given to secure creditors*. Solicitors for complainants contend that it conveyed the fee to the grantee and his heirs upon the theory that one cannot hold both the legal and equitable title at the same time. This is true where one holds the entire legal and entire equitable title. In such event the two estates merge. This is not true where the legal title is held merely as security, or where the trustee is also a beneficiary in only a partial interest as here. The general authorities are to the effect that it is undoubtedly true that the same person cannot be at the same time sole trustee and sole beneficiary of the same identical interest, but a cestui que trust is not absolutely prohibited from occupying the relation of trustee for his own benefit, and especially where he is a trustee for himself and others. 65 Corpus Juris, p. 572, § 337.

On July 21, 1858, Redditt and wife by warranty deed conveyed to John W. Grist the said lands indicated in Section 7, and on March 7, 1860, Grist conveyed to Thomas F. Stickney an undivided half of the lands situated in Baldwin County, Alabama, near the East Prong of Fish River, when owned by said Grist or in which he

298

had an interest or which he has contracted for, or whatever conveyance necessary to vest the title in the said Grist and being about 6,000 acres and being the lands formerly standing in the name of and owned by Williams, Alexander T. Redditt or Williams and Grist, or in the three named Orrelles.

On January 24, 1860, John G. Williams executed the trust deed to Thomas C. Singletary to which we have adverted. On March 11, 1904, the Singletary family recited in a conveyance that they were all the heirs at law and next of kin and nephews and nieces of Thomas C. Singletary, deceased, and executed a deed to Carrie C. McNulty, reciting that Singletary had died without having executed the trust (for himself and others) and sought to convey the property conveyed by Williams to him as trustee; and the recited consideration was $1,750.

On March 22, 1905, Thomas F. Stickney and wife conveyed an undivided one-half interest in the lands acquired from John C. Grist to Carrie McNulty.

The conveyance of June 25, 1896, by Banks and Snead and the Watkins family to Grist, reciting that they were the sole and surviving heirs of John Williams, deceased, of Beauford, N. C., and that the said Williams was unmarried at the time of his death, employed a description sufficient to embrace the lands in controversy. The grantee was T. Green of Mobile, and it was recited that he was a single man. It appears he was the same person as T. Green who conveyed to Carrie C. McNulty the lands in dispute in Section 8 and an undivided half interest in said Section 7 of the lands in dispute; and that said McNulty, an unmarried woman, on December 21, 1911, conveyed by quitclaim deed to C. A. Swift, father of complainants, the lands made the subject of this suit.

The record discloses that on May 19, 1887, J. H. Wynn conveyed to Chas. A. Swift lots 1 to 7, inclusive, in fractional Section 8, with the exception in question therein included. It is shown that Chas. A. Swift and C. A. Swift, the alleged predecessor in title, is the father of complainants, and was one and the same person. It is further shown that Lyons and Lewis conveyed to C. A. Swift the Cataline-Plock Claim in Sections 7 and 8, the same being the West Half of the Thomas-Powell Spanish Grant on the south side of the East Prong of Fish River, except the 300 acres described by metes and bounds. Thus the immediate predecessors in title to appellees reassigned the exception in question, and the lands which are the subject of this suit. This exception is further shown by the conveyances of May 1st, 1883, of Wm. H. Sisson and wife to Tanner-Millen Co., of fractional sections 7 and 8. On September 30, 1902, Nancy, the widow, recited to be the sole heir of Chas. Tanner, and who died intestate, conveyed fractional sections 7 and 8 with the exception of the 300 acres set out therein to T. J. Millen and he and wife conveyed on October 3, 1904, to Lyons-Swift & Co., a partnership composed of Henry Lewis and C. A. Swift, the 300-acre exception being excluded in this conveyances also.

The effect of the notice to appellees' predecessors in title, contained in the various records and deeds and the actual knowledge of the metes and bounds of the 300 acres excepted in the several conveyances, was brought home to the respective grantees and to appellees' predecessor in title, Tanner & Miller, by William H. Sisson riding around and specifically pointing out the lands excepted.

We come to a consideration of the claim on which appellants rest their right on this appeal. It is in tax and sheriffs' deed to Dowty in 1870, his deed to Henry Sisson, the ancestor of appellants, and their title by inheritance and division of land accordingly between the two brothers and the respective claims of adverse possession of each.

■ Taxes were not paid on the lands for the years 1866–1867. Stephen Dowty bought the lands in question at the tax sales of June 1, 1868, and June 3, 1871, and duly obtained a tax deed which was recorded on the same days. There is evidence that in January, 1869, said Dowty bought at sheriff's sale a large body of land, including the lands made the subject of this suit, and that the levy and sale under execution was against John G. Williams and John W. Grist. Dowty received a deed from the sheriff which was duly recorded on January 3, 1870. The deed is ancient. It is insisted that the recitals of the sheriff's deed are not sufficient to show prima facie that the title passed by virtue of the sheriff's sale, because it is not shown by other evidence than that recited in the sheriff's deed that there was a valid judgment upon which the execution had issued and sale had. Being an

ancient conveyance and containing the specific recital that it was shown that a writ of execution had duly issued to the sheriff "in favor of Stephen Dowty and against John G. Williams, surviving partner of the late firm of Williams and Grist issued from the Chancery Court for the First District of the Southern Chancery Division of the State of Alabama at Mobile," commanding the sheriff to make "the amount of judgment, interest and costs of said writ of execution, which the said Stephen Dowty aforesaid had recovered in said court against said defendants," the recitation will be taken prima facie. McMillan v. Aiken, 205 Ala. 35, 88 So. 135; Lyons v. Taylor, 231 Ala. 600, 166 So. 15; Carver v. Jackson, 4 Pet. 1, 29 U.S. 1, 7 L.Ed. 761.

■ It is further indicated that "said recovery" was "Against John G. Williams and John W. Grist." It is clear that from these recitals a judgment was recovered against the individuals John G. Williams and John W. Grist on this partnership liability. That is, it is specifically recited that a judgment had been recovered upon which said execution had issued, and that this execution was levied on the property in question; that the property was sold to Stephen Dowty and the deed purports to convey the property to Stephen Dowty pursuant to said sale. It thus appears that every element, which by statute is made a prerequisite to the prima facie transfer of title by sheriff's sale on execution is recited in the deed in question. The statute applies as well to sheriff's deeds, executed before its passage, as to those executed thereafter. Williams v. Oates, 212 Ala. 396, 102 So. 712; Code 1923, § 7706, Code 1940, Tit. 7, § 419.

■ The statute had the purpose of eliminating the necessity of proving the details of a sheriff's sale, a deed which recites the recovery of a judgment, the issue of execution, the levy of such execution, and sale pursuant thereto, is made prima facie sufficient to show a valid title in the purchaser. Contrary to the rule that existed prior to the statute, such stated fact shifts the burden to one asserting that the sale is invalid to show that there was in fact some irregularity in the proceedings which would invalidate the sale. Code 1940, T. 7, § 419.

In the case of Bonner v. Lockhart, 236 Ala. 171, 181 So. 767, 768, it is said in regard to a sheriff's deed, in view of Section 7706 of the Code, that "A valid judgment, execution thereon, levy and sale, all evidenced prima facie by recitals in the deed, suffice to protect the purchaser."

In Thompson v. Heiter, 238 Ala. 549, 192 So. 282, it was held that where a judgment, execution, levy and sale are recited in the sheriff's deed, no irregularity in the conduct of the sale will suffice to render the sale void on collateral attack. Dean v. Lusk et al., 241 Ala. 519, 3 So.2d 310, 313.

Our statute, however, provided that suit could be brought against the partnership in its firm name and specifically provided that on such a judgment execution could be had on the partnership assets. This was construed to be in effect a suit in rem binding only the partnership assets. Such was the case of McCoy v. Watson, 51 Ala. 466, where the suit was "against J. L. Burson & Co., a partnership, in its firm or common name." It was held that the judgment could not be levied on the individual property of the partner, because the statute only permitted levy on partnership property. This is explained in Yarbrough & Co. v. Bush & Co., 69 Ala. 170, 171, where the court said:

"It is provided by section 2904 of the present Code, 1876, that partners, associated together in any business or pursuit who transact business under a common name, whether it comprise the names of such persons or not, 'may be sued by their common name, and the summons in such case being served on one or more of the associates, the judgment in the action binds the joint property of all the associates, in the same manner as if all had been named as defendants, had been sued upon their joint liability, and served with process.'

"The present suit was brought under this section, by the appellees against the appellants, under their common or firm designation of 'C. S. Yarbrough & Co.' * * *

"When an action is instituted, under the provisions of this statute, against a partnership by its firm name, *without naming the individual partners who comprise it,* and a judgment is rendered against the firm as such, an execution issued on the judgment can only be levied on the partnership property. It will not bind the property of the several individual partners. The action is, therefore, somewhat in the

nature of a proceeding in rem rather than in personam." (Italics supplied.)

In the present case, it affirmatively appears in the sheriff's deed that the recovery was against John G. Williams and John W. Grist and not against the partnership in its partnership name, so that the authority cited has no application whatever to the facts thus disclosed by the recitals of the sheriff's deed.

From that time (execution of deeds at tax sale) the chain of title from Dowty to the time of the instant suit is duly exhibited in the records of the county. Distinguished counsel for appellant observe as to this that while the tax sale deed above referred to did not convey title, coupled with the sheriff's deed above referred to, it indicated why no claim to the land was advanced or no deed to it made by said Williams or his heirs or one claiming under Williams or Grist for more than twenty years; why no claim or deed was made by Thomas F. Stickney under whom Chas. Swift's heirs claim for more than 40 years; and why for a period of more than sixty years no active effort was made to recover possession of any of these lands. In the meantime, the lands had been in the possession of Dowty, or those claiming under him, some of it had been conveyed and reconveyed by deeds of record in the county evidencing an active claim to ownership by appellants' predecessors; it had been turpentined, timbered and a portion thereof (involved in this suit) enclosed and cultivated in large part.

On January 21, 1870, Steven Dowty conveyed to Henry A. Grist 4,500 of the 6,-000 acres he had bought at sheriff's sale and tax sales. This conveyance recited that the lands conveyed and which are in question were "in full and actual possession of said Henry Grist."

At this point we observe of the recitals of these documents, that they are ancient, containing significant facts; that the ones in appellant's chain of title contain facts that said grantor and grantee were in full and actual possession of the said lands in question at the time when conveyed. McMillan v. Aiken, 205 Ala. 35, 88 So. 135; Lyons v. Taylor, 231 Ala. 600, 166 So. 15; White v. Farris, 124 Ala. 461, 27 So. 259; Carver v. Jackson, 4 Pet. 1, 29 U.S. 1, 83 L.Ed. 761, 791; Merwin v. Morris, 71 Conn. 555, 42 A. 855; McMahon v. Stratford, 83 Conn. 386, 76 A. 983, 985; N. Y., etc., R. Co. v. Cella, 88 Conn. 515, 91 A. 972, 975, Ann.Cas.1917D, 590.

If the recited facts be true or prima facie true as to the full and actual possession by Grist, it is presumed to continue as to him and his successors in title, in the absence of evidence of abandonment or interruption thereof, or possession by another under a claim of title. Alabama State Land Co. v. Matthews, 168 Ala. 200, 207, 53 So. 174; Hollingsworth v. Walker, 98 Ala. 543, 546, 13 So. 6. In Abbett v. Page, 92 Ala. 571, 575, 9 So. 332, it is said that in the absence of evidence to the contrary, possession may be presumed to have continued, and that heirs or personal representatives succeed thereto. Marston v. Rowe, 43 Ala. 271.

This presumption of the continuity of actual possession finds support in the evidence of appellant. The record shows that said Grist conveyed several parcels of land evidenced by recorded deeds and mortgages; that he had a home where he lived in 1875; that he sold to Henry Sisson in 1878 and under this conveyance, respondent makes the claim of right, title and ownership. The record further shows that on February 2, 1875, small tracts of land were sold by Grist to Lewis Collins, and to J. A. Nolte, which adjoin the Sisson Subdivision, a part of which is involved here. The record further shows that in November of 1875, Grist mortgaged to Elijah S. Taylor all the lands conveyed to him by Dowty, except fractional Sections 6, 7 and 8 and the Cataline-Plock Tract. This mortgage was paid and cancelled of record. On December 31, 1875, Grist sold 152 acres to Lewis Breton (being a portion of the Cataline-Plock Tract); and on August 26, 1878, sold to Henry Sisson all of the land he had bought from said Dowty, except that which he had sold to Collins, Nolte and Breton. Such actions indicate that Grist was in possession of the several tracts of land, a portion of which he conveyed and mortgaged and exercised acts of ownership to the time of his sale in August, 1878 (unsold portions thereof), to Henry Sisson; and that grantee mortgaged a part of the tract of land to the grantor Henry Grist to secure the unpaid portion of the purchase price. Thus we are brought to a consideration of the evidence as to whether there was a full and actual possession of said lands by Dowty as recited in his ancient deed of January 25,

1870, to Grist and followed by the due acts of ownership by the immediate parties touching the subject for consideration.

William H. Sisson testified that Grist sold the lands to Henry Sisson and at such time Grist was in the quiet and peaceful possession, living on the land, and had occupied a cabin thereon for over three years; that he was present when his father purchased from Grist; that they went to the cabin where Grist lived on the land and the grantor gave his father the key, and the cooking things, turned over to him the cabin and that before and at that time the grantee had a "quiet, peaceful possession until his death in 1892;" that the delivery of the actual possession of the land, the cabin and key was made in his presence; that thereafter his father kept a commissary, began cutting timber, splitting rails and making a fence around the land known as the Lay Tract; that he had hired help, cleared and cultivated said land and this possession continued until 1892.

The record further shows that Henry Sisson bought the Thomas Powell tract from John Nolte in 1879 and built thereon a sawmill, and that witness operated the mill and logged Sections 7 and 8, which were bought from Grist. He further said that said Sisson planted 150 four-year-old orange trees on what is now Lot 8 of the Sisson Subdivision, and planted eight pecan trees; that the fences were kept in repair and possession retained during the father's lifetime and that no part of the lands ever passed from him (except the Lay Tract) by reason that the government had not then granted a patent thereto to Henry Sisson or his predecessors.

The record further shows that on July 16, 1882, Henry Sisson and wife conveyed to William H. Sisson all the land conveyed to him by Henry A. Grist, except a comparatively small portion thereof, and except the land retained to the father and that grantor reserved; that the lands conveyed were in Sections 7 and 8, involved in this suit. It is further shown that after William H. Sisson got the deed to said Grist lands from his father, Henry Sisson (with the exception indicated), on August 4, 1882, mortgaged the land to Thomas P. Millen & Co.; that when Tanner and Millen bought from William H. Sisson and the latter conveyed, said grantor did not own the lands described in the indicated and noted exception; that he had no claim to the lands so excepted; and of this Tanner & Millen had knowledge and due notice by the deed, the mortgage indicated, and by having the tract excepted pointed out to them by the grantor.

It is an established rule of this court that equity as well as law charges a party with such knowledge as is gained by an inspection of the record as provided or suggested by ordinary prudence. Alabama Coal & Coke Co. v. Gulf Coal & Coke Co., 171 Ala. 544, 549, 54 So. 685.

In the deed from Sisson to Tanner & Millen the exception is not described with accuracy. The excepted portion in former deed was under fence, improvements had been made thereon, and a considerable part was in cultivation, the balance being in pasture lands. It is manifest that the grantor did not attempt to sell and the grantee did not attempt to buy the title to the exception or reservation which Henry Sisson had withheld from his deed to the son William H. Sisson, and under the latter's sale to Tanner & Millen the same was excepted. Of this fact the grantor Sisson testified that he and wife conveyed to Tanner & Millen only the lands which the father had conveyed to him; that before the deed was executed, Mr. Tanner and grantor and his brother rode around the lands which it was agreed and was reserved for Henry Sisson, and that such was the understanding as to the conveyance to Tanner & Millen; that said grantees never had claimed any right to the excepted land, which was under fence, occupied and cultivated from 1879 until 1892, and that Sisson paid all the taxes accruing thereon.

Complainant examined no witnesses who knew the lands prior to the death of Henry Sisson in 1892. Respondent examined two witnesses, in addition to William H. Sisson, who had personal knowledge of the lands prior to date indicated. These witnesses are Mathew Nolte, the son of John Nolte, who had bought the tract just north of the Sisson subdivision from Henry A. Grist, and knew the lands when said Grist was in possession of same and when the sales were made to Henry Sisson, to William H. Sisson and to Tanner-Millen Co. The other witness was A. J. Weeks, who corroborates, as to possession, the testimony of Nolte and William H. Sisson as to facts as to purchase, improvement, cultivation and peaceful and uninterrupted

possession of the land. Witness Weeks told of Col. Barber's bringing cattle and race horses, pasturing the same under direction of his two men, who occupied the buildings erected on the land owned by Henry Sisson, and that said Barber stayed near the river for about four or five years.

Michael A. Weeks stated that he knew the lands as being those of Sisson; that the Lay Homestead part of the excepted acreage had been under fence and that the fence at that time covered more land than the Lay Homestead; he remembered the old house site and the big oak tree; that the old ruins of the house were there yet; that the "house was settled down to the ground and there is an old well there and part of an old fence."

As we understand the evidence, it is that Henry Sisson took possession from Henry A. Grist, who was himself in actual possession of these lands and living in a house on the subdivision, cleared, pastured and cultivated portions of the tract which he later reserved for himself and where he continued to live for a long while; that he built a small house and barn on the Lay Tract, which was reserved; that he cultivated lands lying west of that bought by Sidney Weeks from the Sisson heirs. We believe that the weight of the testimony shows that Henry Sisson bought from one in the uninterrupted possession and actual occupancy of the tract; that this tract had been improved and cultivated; that he reserved for himself lands in question when he conveyed his other land to his son William H. Sisson, and that the father under the undisputed testimony continued to cultivate and use the lands so long as he lived to 1892. We are further of opinion that the lands in question continued openly and uninterruptedly to be held by and for the owner for over ten years by appellant and predecessors. It would follow that regardless of the state of the title, as it has previously been exhibited as to appellees, Henry Sisson had the title to the lands and uninterrupted possession at the time of his death and that had evidenced by improvements and occupation of the lands by him, adverse possession and use of part of it under color of title, which gave him possession of all of the lands in question and ripened his title to all lands described in his color of title. It is established by the evidence that adverse possession of respondent's predecessors in title began as early as January, 1870, when the property came into the full and actual possession of Henry A. Grist, as recited in the deed from Steve Dowty to said Grist. Such possession is presumed to have thus continued, there being no evidence that it did not so continue.

It is further established that the running of adverse possession for the prescriptive period, or the statute of limitations of ten years, within the rules that obtain, defeats previously existing record title to the contrary. Thereafter a conveyance by the holder of the apparent record title was ineffectual to convey title as against adverse possession and title so acquired. McInerny v. Irvin, 90 Ala. 275, 7 So. 841; Normant v. Eureka Co., 98 Ala. 181, 12 So. 454, 39 Am.St.Rep. 45; Baker v. Heirs of Chastang, 18 Ala. 417.

It results that the deed of William H. Sisson to Tanner & Millen under which complainant asserts title could not convey title to the lands excepted in the William H. Sisson subdivision which had been expressly reserved by Henry Sisson in his deed of July 16, 1882 to William H. Sisson. In Clements et al. v. T. S. Faulk & Co. et al., 181 Ala. 219, 61 So. 264, 266, it is declared: " * * * The grantors in the deeds to T. S. Faulk and O. N. Faulk only conveyed the interest which they owned in the lands at the date of the conveyance, and the covenants of warranty can only refer to the interest which they then undertook, intended, and, in fact, conveyed. The covenants of warranty cannot be construed as covering any future interest which the grantors might by purchase or inheritance acquire in the other undivided six-eighth interest in the land, to which at the time of the conveyances to said T. S. Faulk and O. N. Faulk the said grantors had no right or title whatever, and to which by said conveyances they intended to convey no right or title whatsoever. We cite no authority to sustain this position, as we deem a citation of authority unnecessary."

See, also, Wheeler v. Aycock, 109 Ala. 146, 151, 19 So. 497.

The only way William H. Sisson could convey any title subsequently acquired would be by way of estoppel when he had no title to transfer. In Chapman et al. v. Abrahams, etc., 61 Ala. 108, Judge Stone said: "It is settled in this State that if

one, having at the time no title, convey lands by warranty—even the warranty which the law implies from the employment of the words grant, bargain, sell or convey—and afterwards acquire title, such title will enure and pass eo instanti to his vendee. This, by a species of estoppel.— Stewart v. Anderson, 10 Ala. 504; McGee v. Eastis, 5 Stew. & P. 426; Kennedy v. McCartney's Heirs, 4 Port. 141; Carter v. Doe ex dem. Chaudron, 21 Ala. 72, 91. * * *"

See, also, Threefoot v. Hillman, 130 Ala. 244, 255, 30 So. 513, 89 Am.St.Rep. 39.

Estoppel is an equitable doctrine to accomplish justice under the facts and circumstances of each particular case. We have indicated that facts show that William H. Sisson had no intent to sell and Tanner & Millen had no intent to buy property which the grantor did not then own. It follows there was no basis for an estoppel against the grantor so as to compel a conveyance of the title to land contrary to the intention of both parties to the deed. It is an ancient rule that estoppel can never be invoked or used to accomplish a result contrary to the intent of the parties so as to work injustice. Adler v. Pin, 80 Ala. 351.

If William H. Sisson's deed of August 4, 1882, had not estopped him from denying that it conveyed the title to Tanner & Millen of his father's land, and which he later inherited from his father at his death in 1892, his continuing in the adverse possession of the lands in question after his father's death, under the bona fide claim of inheritance of more than ten years, his cleaning, fencing and cultivating a part of his share of the Sisson subdivision continuously to 1935, vested him with title to the lands by adverse possession. This right he could assert and his grantees and successors in title may so assert. Doolittle v. Robertson, 109 Ala. 412, 19 So. 851.

In Mahan v. Smith, 151 Ala. 482, 485, 44 So. 375, it is said: " * * * The rule seems to be established that the grantor, remaining in possession of the land, may become an adverse holder as against his grantee, and may by such adverse possession for the necessary period acquire title. And the rule seems further to be settled that the doctrine of estoppel against a vendor cannot be invoked as to a subse-quently acquired title by adverse possession. Abbett v. Page, 92 Ala. 571, 9 So. 332; Yancey v. Savannah & Western Railroad Co., 101 Ala. 234, 13 So. 311; Doolittle v. Robertson, 109 Ala. 412, 19 So. 851. * * *"

The same holding was maintained by Mr. Justice Foster in Henderson et al. v. Noland, 238 Ala. 213, 219, 189 So. 732, 736, 123 A.L.R. 483, as follows: "But an estoppel by a warranty deed when effective passes the legal title afterwards acquired,— Parker v. Marks, 82 Ala. 548, 3 So. 5; 58 A.L.R. 351 note,—except when the title was afterwards acquired by adverse possession. Doolittle v. Robertson, 109 Ala. 412, 19 So. 851."

The doctrine invoked by appellee to defeat appellant's title is estoppel. A court of equity will not apply this doctrine when it is clearly apparent, as it is in this case, that it never was the intention of William H. Sisson to sell or of Tanner & Millen to buy and to take away from such grantor under his warranty lands which he did not then own and which he never intended to sell. We have indicated that the Sissons pointed out to Tanner, who represented the purchaser, the lands intended to be sold and that to be reserved,—pointed out to Tanner that the reservation of this tract of about 300 acres was kept for the father as his property and which could not and was not intended to be conveyed. This evidence convinces us that it was distinctly understood that this Sisson Subdivision or exception was not included in the sale and purchase for the all sufficient reason that it did not belong to William H. Sisson. We are resting the decision on the question of merit hereinabove discussed and not that of a scrambling possession.

Moreover, when the whole evidence is looked to, complainants had no more than a scrambling possession to the lands or portions thereof and were not entitled to quiet title even if complainants had a title to part of the land where only one of the tenants had attorned. Donohoo v. Smith, 207 Ala. 296, 92 So. 455.

It would serve no good purpose to extend the discussion of the evidence in the record. It has been carefully examined. We are of opinion, and hold, that the decree of the circuit court is founded in error as to the lands in fractional Sections 6, 7 and 8, Township 8 South, Range 3 East, according to the Durant Map of the Sisson lands

recorded in Map Book 1, p. 2, in the office of the Probate Judge of Baldwin County, Alabama, which are claimed and owned by the named respondents-appellants here.

The decree of the circuit court is reversed and remanded for correction as to respondents' lands indicated and for correction of the records of the Probate Office accordingly.

The appellees are taxed with the costs. Reversed and remanded.

All the Justices concur, except KNIGHT, J., not sitting.

### On Rehearing.

THOMAS, Justice.

The application for rehearing presents a question not urged or considered on the original hearing and further re-argument of the matter of estoppel in a different light from that previously taken up.

The warranty deed from Henry and Margaret A. Sisson of date of July 16, 1882, to their son William H. Sisson was a conveyance of a large tract of land, the specific exception of 300 acres for the father being embraced therein. It should be remarked further that this exception was of the homestead of the grantors and that part lay in fractional Sections 7 and 8 in T. 8 South of Range 3 East, Baldwin County, and was adjacent to the two Spanish Grants of Cataline Plock and Thomas Powell. This deed was duly recorded on July 25, 1882, in the records of the Probate Office of Baldwin County, Alabama.

On May 1st, 1883, William H. Sisson and wife by a quitclaim deed conveyed their interests in said lands to Chas. Tanner and John Millen, containing the exception of 300 acres of land, which is incorrectly described as 300 acres lying in Section 7 and not extending, as it does, into Section 8. The habendum and tenendum clauses therein were like unto that employed in the conveyance. Garrow et al. v. Toxey, 188 Ala. 572, 66 So. 443; Garrow v. Toxey, 171 Ala. 644, 54 So. 556. The Reporter will set out the foregoing conveyances from Henry to William H. Sisson and from the latter to Tanner and Millen.

It is now urged that the clauses indicated brought this case (as to estoppel against William H. Sisson to acquire the title by inheritance from his father in 1892) within the rule of the Garrow cases.

In Garrow et al. v. Toxey, 188 Ala. 572, 66 So. 443, 445, Mr. Justice De Graffenried recognized the right which has prevailed to this date of acquiring lands by adverse possession by one so estopped, notwithstanding the fact that the unusual provisions contained in the deed being considered raised an estoppel under the facts of that case. His words are as follows:

"In this case the defendants were in such a position that, to defeat the plaintiff's right of recovery, it was necessary for them to show that they or those through whom they claimed the land had, at some period, been in the adverse possession of the lands, claiming them as their own, for a period of ten years.

"It is needless for us to here define adverse possession, or to say when a party has offered sufficient evidence of possession with accompanying acts of ownership, for ten consecutive years, so as to place that question within the province of a jury as an issue of fact for their determination * * *."

This holding was in accord with the expressions by Mr. Justice Sayre in Garrow et al. v. Toxey, 171 Ala. 644, 54 So. 556, 558, as follows: "* * * We think we must take the conveyance as a mere release or quitclaim. Nor does it appear that Gazzam was in possession at the time; and defendants took these points. Where one person makes a quitclaim to another, and afterwards obtains a patent for the same lands, the title of the patent does not inure to the grantee in the quitclaim, as it would in the case of a conveyance with warranty of title. Tillotson v. [Doe ex dem.] Kennedy, 5 Ala. 407, [39 Am.Dec. 330]. On the case as it is made to appear to us as of the time when the quitclaim was received in evidence, there was error in overruling the objections taken to it. The grantor by release or quitclaim is not responsible for the goodness of his title, and such a conveyance does not operate to pass or bind an interest not then in existence. The bargain between the parties proceeds upon this view, and the consideration is regulated in conformity with it. Val Rensselaer v. Kearney, 11 How. 297, 322, 13 L.Ed. 703. A quitclaim does, however, convey the interest or estate of which the grantor is seised and possessed at the time. * * *"

The opinion concludes with the observation that: "* * * Any possession held by Garrow subsequent to 1813 and prior to the patents under which the parties claimed was of no consequence as affecting that title. If possession in Garrow subse-

quent to the patents had been otherwise shown, no doubt his affidavit would have been received as a contemporary declaration illustrative of the character and intent, as of the res gestæ, of such possession. But no such possession was shown. * * *"

■ Thus these opinions recognize the right to acquire lands by adverse possession as against any estoppel that may be raised. Doolittle v. Robertson, 109 Ala. 412, 19 So. 851; Henderson v. Noland, 238 Ala. 213, 189 So. 732, 123 A.L.R. 483.

On the original hearing the judgment was rested and the result announced on the evidence tending to show adverse possession on the part of the respondents as against the claims of appellees. We may observe further of the Garrow cases that the facts on which the decisions rested were that the equity in the land conveyed was thereafter supported by the legal title which remained in the United States and that a short while after making the quitclaim deed with the unusual clauses indicated, the patent was duly issued to such grantor. Hence the estoppel against him was effective and in support of his deed and against his claim as patentee for the short while indicated.

In the original opinion we adverted to the rules as to estoppel, that each case rests upon its own particular facts and circumstances, and that an estoppel can never be invoked to accomplish a result contrary to the intent of the parties or by such invocation work an injustice between the parties as to the subject-matter. Adler v. Pin, 80 Ala. 351; 31 Corpus Juris Sec. p. 203, § 21 et seq.

■ Under the facts as we find them in this record though there is conflict in the evidence, we will not do the injustice of enforcing the estoppel against William H. Sisson (the son) as to the father's land and homestead (Henry Sisson's homestead), which the latter held until his death in August, 1892, and thereafter by Martha Sisson, the wife of Henry, and the mother of William H., to the date of her death in 1917, and by the two sons William H. and Wesley Sisson to the date of their division of the common properties in 1915, and their respective adverse holdings to the date of this decree.

In the original opinion on the question of notice we adverted to the fact that William H. Sisson testified when he was contemplat-ing the sale to Tanner & Millen of the large tract of land he owned, that Chas. Tanner rode around the 300-acre exception of land then under fence and cultivation. The opinion and result announced were not rested entirely on this piece of evidence, which was material and relevant, but such was persuasive of notice when taken into consideration with all other evidence of the nature and extent of the exception and of its adverse holding at the time by Henry Sisson, father of contemplated grantor.

It is now insisted that this evidence was incompetent as being a transaction with one of the deceased grantees, Charles Tanner, and whose estate, it is insisted, is interested in the result of the suit and proceeding. Code 1940, Tit. 7, § 433; Dent v. Foy, 210 Ala. 475, 98 So. 390.

The answer to depositions by a nonresident covered every phase of and questions presented in the case. The abstract shows deeds by the heirs and next of kin of Chas. Tanner. From this the inference is or may be taken that said grantee Chas. Tanner was dead at the time of the giving of the testimony by William H. Sisson. The record shows conveyances thereafter by John Millen, one of the grantees named in the aforementioned deed.

■ When the whole evidence is considered, we cannot find that the estate of said Tanner was interested in the result of this suit to quiet title or remove a cloud from the lands to be determined more than 40 years after the deed to Tanner & Millen and after the quitclaim deed given by the heirs at law and next of kin of Chas. Tanner to the said lands of date of September 30, 1902.

■■ It is unnecessary that we further declare as to the competency of the piece of evidence in question or of the nature of objection or exception taken, if the same was duly objected to and exception noted. It may be observed for convenient reference that the rule that obtains, under the issues of fact presented by the pleading, *is that of force at the time of the trial in this jurisdiction as to competency.* 31 Corpus Juris, Sec., § 15, p. 158 et seq.; Myrick v. Myrick, 230 Ala. 282, 160 So. 895. *The manner of making objection and reserving and noting an exception to evidence in equity cases is that which obtains when the evidence is given.* See Code 1940, Tit. 7 Appendix, Equity Rule 55, Code 1923, § 6577, Old Rule 65; Elyton Land

Co. v. Denny, 108 Ala. 553, 18 So. 561; Michie's Code 1928, § 158 [65] p. 1947; Acts 1923, p. 631, § 1, Code 1940, Tit. 12, § 115; Thompson v. Heiter, 238 Ala. 549, 192 So. 282; Des Portes v. Hall, 238 Ala. 641, 192 So. 899; Code 1923, § 6565 is omitted from the Code of 1940.

We repeat, however, that in the original opinion, we rested the decision and judgment on the fact of adverse possession of the 300 acres of land in question by the respective respondents to the time of the trial, and that they had the right to maintain such adverse possession against the appellees and their predecessors in title.

It follows from this that the result and judgment rendered was without error and the application for rehearing is overruled.

Application for rehearing overruled and opinion extended.

All the Justices concur.